# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

ROBIN LOBERG,                              )
                                           )
                    Plaintiff,             )
                                           )
          v.                               )     Case No. 08-0306-CV-W-NKL-SSA
                                           )
MICHAEL J. ASTRUE,                         )
                                           )
                    Defendant.             )
                                           )
                                           )

## ORDER

Plaintiff Robin Loberg ("Loberg") challenges the Social Security Commissioner's ("Commissioner") denial of her application for disability, disability insurance benefits, and supplemental security income benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, *et seq*, and §§ 1381, *et seq*. Loberg's initial application was denied, and she appealed the denial to an administrative law judge ("ALJ"). After an administrative hearing in December 2006, the ALJ found that Loberg was not "disabled" as that term is defined in the Act. The Appeals Council denied Loberg's request for review, rendering the ALJ's decision the final decision of the Commissioner. She brings this action for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g). Because the ALJ did not properly consider the evidence, the Court remands the matter to the ALJ for further proceedings in accordance with this Order.

# I.    Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1]

## A.    Age and Education

Loberg was born on February 3, 1956; therefore, she was forty-six years old on June 27, 2002 (her alleged onset date), and fifty years old at the time of her hearing. (Tr. 61.) She graduated from high school and completed two years of college. (Tr. 582-83.)

## B.    Work Experience

Loberg has past relevant work as a school bus driver, receptionist, hand packager, light truck driver, welder assembler, and support analyst. (Tr. 582, 600-602.) She last worked for six years as a computer technical specialist at H&R Block. (Tr. 583.) Loberg left that job in June 2002 after she developed problems with her arms. (Tr. 584.) She tried to go back to work in January 2003, but was only able to work for two weeks before she had to quit. (Tr. 128.)

## C.    Living Situation

At the time of the hearing, Loberg was living in the basement of her daughter's home. (Tr. 588.) She had difficulties going up and down the stairs, and testified that she almost crawled up the stairs and went down sideways. (Tr. 595-96.) Loberg testified that she had trouble getting out of bed in the morning because of stiffness, reporting that she rolled on her

---

[1] Portions of the parties' briefs are adopted without quotation designated.

side to get to her feet.  (Tr. 590.)  She also had difficulties taking care of herself.  (Tr. 138.) Because of the pain in her hand and arm, she stated she had problems brushing her hair, pulling clothes over her head, and brushing her teeth.  (Tr. 138.)

Loberg stated that she attempted to help with chores around the house, but had to take breaks every ten minutes.  (Tr. 138, 594, 595.)  Doing a sink full of dishes would take her all day.  (Tr. 594.)  Loberg had difficulties grasping items like knives and lifting pots, making cooking a challenge.  (Tr.124.)  She reported that her daughter cooked most of her meals. (Tr. 594, 595.)

Loberg stated she was only able to drive for brief periods of time because she had difficulties grasping the steering wheel with her right arm.  (Tr. 125, 138, 588.)  Loberg also noted that she did not trust herself to drive at all when she had taken her medications.  (Tr. 125, 588.)

Her medication side effects included dizziness, severe drowsiness, and occasionally feeling completely "knocked out."  (Tr. 597-98.)  Loberg reported difficulties sleeping on her back because of the pain.  (Tr. 124, 598.)  She said she slept four to six hours a night, rarely napping unless she took certain medications.  (Tr. 598.)

### D.    Medical Evidence

Loberg has been diagnosed with cubital tunnel syndrome, right lateral epicondylitis, degenerative disc disease, degenerative joint disease, right rotator cuff tendonitis, Meniere's disease, mild hearing loss, and anxiety.  (Tr. 23, 141, 187, 307, 312, 385, 440, 452, 461, 480, 501, 504, 511.)  At the time of the hearing, Loberg was being prescribed Relafen for the pain

3

and swelling in her arm, Xanax for her nerves, Cymbalta, Diovan for blood pressure, Meclazine for Vertigo, and Vicodin as needed. (Tr. 587-88, 593.) She testified that the side effects include dizziness and drowsiness. (Tr.597-98.)

### E. Medical Evidence: Sources

#### 1. Treating Physician – Liberty Family Physicians

Loberg began treatment at Liberty Family Physicians in 2000. (Tr. 452.) Since that time she has treated with all three doctors in the practice, Chris Trimble, M.D., Sean Tarsney, M.D., and Kendall Walker, M.D., for symptoms associated with degenerative disc disease, degenerative joint disease, Meniere's disease, cubital tunnel syndrome, and chronic resistant right lateral epicondylitis. (Tr. 452, 511.)

On April 4, 2002, Dr. Trimble reported that an x-ray of Loberg's left hip revealed mild degenerative changes, and diagnosed her with degenerative joint disease. (Tr. 504.) He further noted a history of knee reconstruction and mitral valve regurgitation. (Tr. 504.) Three weeks later, Loberg reported lower back pain on the left side of her rib cage, which flares up to where she cannot move. (Tr. 503.) On examination, Dr. Trimble reported some tenderness and spasm along the lower rib cage just lateral on the left side to the spinal column. (Tr. 503.) X-rays revealed spondylolisthesis at L5-S1 and degenerative changes in the thoracic spine. (Tr. 503.)

Loberg presented to Dr. Tarsney on June 25, 2002, reporting a ten day history of right elbow pain. (Tr. 502.) Dr. Tarsney noted mild tenderness to the elbow laterally and pain on pronation and supination. (Tr. 502.) He placed Loberg in a sling for comfort. (Tr. 502.)

4

Two days later, Loberg returned with continued symptoms, as well as some tingling and a decreased grip. (Tr. 501.) She was diagnosed with right lateral epicondylitis. (Tr. 501.) The following month, Loberg reported that her pain had not improved. (Tr. 500.) Dr. Tarsney noted mild swelling and referred Loberg to physical therapy. (Tr. 500.)

In January 2003, Loberg continued to complain of pain and tingling down the ulnar distribution of her right arm. (Tr. 496.) She further reported significant anxiety, sleep difficulties, and sadness. (Tr. 496.) Dr. Tarsney noted that Loberg appeared tearful and that her right elbow was swollen most notably on the medial aspect. (Tr. 496.)

Loberg presented with lower back pain on August 27, 2003, noting radiation down her right leg. (Tr. 494.) On examination, Dr. Tarsney reported tenderness and spasms in the lumbar area of Loberg's left side. (Tr. 494.)

In 2004 Loberg continued to have difficulties with abduction, rotation, and supraspinatus testing of the right elbow. (Tr. 482.) In June 2004, she began to report constant pain in her right shoulder, worsening with any activity. (Tr. 480.) Loberg described numbness throughout her entire arm and occasional muscle spasms. (Tr. 480.) Dr. Tarsney opined that Loberg's right arm issues were "two distinct problems." (Tr. 480.) He reported diffuse tenderness in Loberg's right shoulder lateral, anterior, and posterior aspect with weakness of the supraspinatus and internal rotation. (Tr. 480.) Dr. Tarsney diagnosed Loberg with rotator cuff tendinitis. (Tr. 480.)

Loberg was evaluated at Liberty Hospital on September 21, 2004, for frequent episodes of chest pains over the prior seven to ten days. (Tr. 387.) Loberg described

5

pressure "as someone is standing on her chest." (Tr. 383.) She reported occasional "flip-flops" of her heart mostly occurring with excessive activity. (Tr. 388.) An echocardiogram performed the following day revealed normal left ventricular systolic function. (Tr. 424.) Dr. Tarsney opined that this was likely "a manifestation of her anxiety." (Tr. 385.)

Dr. Walker examined Loberg on July 1, 2005, for continued complaints of right arm pain. (Tr. 463.) Loberg reported pain in her elbow, shoulder, wrist, knees, neck, and low back. (Tr. 463.) On examination, Dr. Walker noted moderate tenderness over the medial and lateral epicondyles area of the right arm, as well as some arthritic changes with loss of range of motion in the both thumbs. (Tr. 463.)

Loberg again presented to Dr. Trimble on October 6, 2005, with complaints of severe left knee pain for the past two months. (Tr. 461.) She described the pain as sharp and shooting, worsening with standing. (Tr. 461.) Loberg noted occasional swelling and sudden sensations of her knee locking or suddenly giving way on daily basis. (Tr. 461.) An x-ray revealed moderate degenerative changes of the knee. (Tr. 461.) Dr. Trimble noted a diagnosis of left knee pain and degenerative joint disease. (Tr. 461.)

On October 20, 2005, Dr. Trimble completed a Residual Functional Capacity Questionnaire that set out Loberg's limitations in detail. (Tr. 452-56.) Dr. Trimble reported Loberg's symptoms to include vertigo, hearing loss, chronic, limiting back pain, and significant weakness and poor lack of mobility in her right arm. (Tr. 452, 460.) He opined these symptoms would frequently interfere with attention and concentration needed to

6

perform even simple work tasks. (Tr. 453.) Physically, Dr. Trimble opined that Loberg would be capable of standing and sitting for less than two hours in an eight hour workday. (Tr. 454.) He further noted that Loberg could only occasionally lift less than ten pounds. (Tr. 454.) Dr. Trimble opined that Loberg would need the ability to take unscheduled breaks twice per hour for five to ten minutes in duration. (Tr. 454.) In addition, Dr. Trimble opined that Loberg would miss more than four days of work per month as a result of her impairments. (Tr. 455.) Dr. Trimble included the opinion that Loberg likely needed full Social Security benefits. (Tr. 460.)

On September 13, 2006, Loberg complained of right knee and joint pain for the past month, progressively worsening. (Tr. 544.) On physical examination, Dr. Trimble reported that Loberg exhibited a decreased range of motion in her left elbow with noted tenderness medially. (Tr. 544.) Pain was also noted at the lateral joint line of Loberg's left knee with crepitus palpated over the inferior patella. (Tr. 544.) The following week, Dr. Trimble opined that Loberg's condition had not improved since he completed the questionnaire in October 2005. (Tr. 555.)

### 2.    Liberty Orthopedics

Loberg presented to Liberty Orthopedics in July 2002 with complaints of pain in the lateral aspect of her right arm for over two years. (Tr. 187.) She reported that the pain is present with any type of gripping or lifting and has been unresponsive to conservative therapy. (Tr. 187.) Pain was noted over the lateral epicondyle to palpation and with hand squeezing and lifting. (Tr. 187.) Richard Curnow, M.D., opined that Loberg was suffering

7

from lateral epicondylitis and gave her a steroid injection. (Tr. 187.) The following month, Loberg continued to report pain about the lateral aspect of the right elbow, pain with gripping and keyboard use, as well as with any repetitive work with her hands or fingers. (Tr. 187.) Examination showed "exquisite tenderness on the epincondylar ridge." (Tr. 187.) She again received a steroid injection August 20, 2002, and a follow-up appointment was recommended. (Tr. 187.) In September 2002, Dr. Curnow referred Loberg to Craig Newland, M.D., for further evaluation. (Tr. 186.)

Following a September 23, 2002 evaluation, Dr. Newland reported that the ulnar nerve subluxed the elbow, and palpation incited some hypoesthesias in the ulnar nerve distribution. (Tr. 186.) He further reported exquisite tenderness at the lateral aspect of Loberg's elbow. (Tr. 186.) Dr. Newland restricted Loberg to lifting and carrying no more than ten pounds with her right hand. (Tr. 186.) A follow-up MRI revealed a small effusion and mild extensor tendinosis. (Tr. 189.) On November 5, 2002, Dr. Newland performed a debridement of extensor origin on Loberg's right elbow. (Tr. 185, 394.) The next month, Loberg returned for a follow-up appointment, noting ongoing symptoms continually worsening. (Tr. 184.) Loberg stated a desire to proceed with a cubital tunnel operation. (Tr. 184.)

### 3. Rockhill Orthopedics

Loberg was referred to Rockhill Orthopedics in January 2003 for a second opinion with regards to her right elbow pain and swelling. (Tr. 311.) Loberg reported daily pain in the medial aspect of her elbow and forearm, with associated numbness, tingling, and swelling. (Tr. 311.) On examination, Scott Langford, M.D., reported positive Tinel's sign

8

directly along the ulnar nerve with tenderness, as well as tenderness directly over the medial epicondyle when the elbow is flexed. (Tr. 311.) Loberg noted pain in her elbow with resisted extension of the wrist, extension of the long finger with the arm held out straight, and with supination of the forearm. (Tr. 311.) Grip strength was eleven kilograms on the right and twenty-four on the left. (Tr. 311-12.) Dr. Langford opined that Loberg may be suffering from cubital tunnel syndrome, and recommended a nerve conduction study. (Tr. 312.) While that study did not reveal any significant abnormalities, Dr. Langford continued to diagnose cubital tunnel based on the clinical evidence. (Tr. 307.) He recommended therapy for Loberg's lateral elbow pain and possible surgery for the ulnar nerve. (Tr. 192-294, 307.) On February 5, 2003, Loberg underwent a right elbow ulnar nerve release with anterior transposition. (Tr. 348.) On July 14, 2003, Dr. Langford opined that Loberg had reached maximum medical improvement, with a permanent work restriction of no lifting greater than 20 pounds with the right upper extremity. (Tr. 295.)

### 4. Brent Koprivica, M.D.

Brent Koprivica, M.D., performed an independent evaluation on October 8, 2003. (Tr. 314.) It appears that his evaluation was for purposes of a worker's compensation or private disability insurance analysis. Dr. Koprivica noted Loberg to splint her right arm at all times, and that her grip strength on the right ranged from one kilogram to seven kilograms, as compared to 15 to 26 kilograms on the left. (Tr. 328.) Dr. Koprivica reported that Loberg had severe right lateral elbow pain with grip strength testing and difficulty holding the dynamotor independently with the right arm. (Tr. 328.) Loberg had marked sensitivity of

9

the right medial elbow with Tinel's testing. (Tr. 329.) She also had paresthesias into the right middle, ring, and little fingers with forced elbow flexion testing on the right. (Tr. 329.)

Dr. Koprivica also noted significant low back pain on examination with limited range of motion on active motion testing. (Tr. 329.) Loberg demonstrated weakness when attempting to arise from a squat, secondary to knee pain. (Tr. 329.) Dr. Koprivica reported that with heel and toe ambulation Loberg also limped on the left due to knee pain. (Tr. 330.)

Overall, Dr. Koprivica felt Loberg would be incapable of repetitive tasks with her right upper extremity. (Tr. 331.) He restricted her lifting and carrying to a maximum occasional of 20 pounds, primarily with her left upper extremity. (Tr. 331.) Dr. Koprivica restricted Loberg from any frequent or constant lifting and carrying. (Tr. 332.) Because of pre-existing left knee pain, Dr. Koprivica restricted Loberg from sustained squatting, crawling, kneeling, or climbing. (Tr. 331.) He also noted that Loberg had pre-existent disability based on chronic low back pain, and restricted her from frequent or constant bending at the waist, as well as pushing, pulling, or twisting. (Tr. 332.) Dr. Koprivica indicated that Loberg had the ability to work as a teacher if she received re-education at that time.

### 5. Truman Medical Center

In December 2004, Loberg was referred to Truman Medical Center's (TMC) Orthopaedic Clinic for evaluation of her right shoulder pain and suspected rotator cuff tear. (Tr. 439.) She described the pain as feeling like she is reaching towards a rubber band every time she moves her right shoulder. (Tr. 439.) An x-ray of Loberg's right shoulder revealed

10

type II acromion without evidence of subacromial spurs and mild acromioclavicular joint osteoarthritis. (Tr. 439.) Joshua Niemann, M.D., opined that the cause of Loberg's pain was likely rotator cuff strain versus a tear, further recommending physical therapy. (Tr. 440.)

The following month, after six weeks of physical therapy, Loberg returned to TMC reporting limited improvement. (Tr. 438.) Loberg had increased swelling of the right elbow region, with noted numbness and tingling in her fingers. (Tr. 438.) An MRI was essentially normal with some edema underneath the supraspinatus tendon and loss of cartilage. (Tr. 437, 441.)

### 6. Rehabilitation Institute

Loberg was referred to the Rehabilitation Institute of Kansas City in September 2005 for an exploratory job objective evaluation. (Tr. 141-46.) A primary disability of spondylolisthesis was noted, with internal right derangement of the right knee as a secondary diagnosis. (Tr. 141.) Loberg presented in constant pain during the evaluation, walking at a slow, deliberate pace. (Tr. 144.) It appeared that she was constantly trying to battle the pain. (Tr. 144.) It was noted that Loberg has a valid driver's license, but should avoid extensive driving due to pain, vibration, chronic fatigue, and vertigo. (Tr. 144.) Barriers to employment were noted to include: avoidance of extensive writing and grasping; concentration difficulties; 20 pound lifting restriction with the left arm, three pounds on the right arm; avoidance of extensive standing and walking; avoidance of bending, stooping, crawling, climbing, and squatting; avoidance of repetitive arm movements, such as typing;

11

endurance difficulties; finger and manual dexterity difficulties; symptoms of vertigo; debilitating migraine headaches; and chronic fatigue. (Tr. 142.)

Based on the barriers, the evaluation team agreed that "employment would be difficult for Loberg and may be detrimental to her health, as stress exacerbates her symptoms." (Tr. 142.) Overall, the evaluation team opined that:

> due to Ms. Loberg's physical limitations, chronic pain, inability to sit/stand/write for any amount of time, chronic fatigue, and debilitating migraines, she would not be able to return to work at this time. Based on her reports and observations during testing, the evaluation team agrees that she would not be competitively employable....

(Tr. 141.)

### 7. Robert Buzard, M.D.

Robert Buzard, M.D., examined Loberg on April 7, 2004, at the request of Disability Determination Services (DDS). (Tr. 357-60.) Loberg reported pain in her elbow for the past two years, with a history of two separate operations. (Tr. 357.) She described the pain over the medical aspect of her elbow, as well as in the proximal arm and into the forearm. Loberg noted that her pain is exacerbated by driving, washing dishes, folding laundry, vacuuming, and typing. (Tr. 357.) Loberg described daily, low back pain since an on-the-job injury in 1993. (Tr. 357.) She reported that the pain makes it difficult to bend at the waist and causes sleep difficulties. (Tr. 357.) Loberg occasionally experienced tingling and pain into her left lower extremity. (Tr. 357.) She also complained of stiffness and swelling her left knee, noting pain with squatting, crawling, and standing for extended time periods. (Tr. 538.)

12

Finally, Loberg reported a history of Meniere's disease with weekly episodes of vertigo. (Tr. 358.)

On examination, Dr. Buzard noted limited extension in Loberg's right elbow and tenderness in the paralumbar muscles bilaterally. (Tr. 359.) Tenderness and swelling was also reported over the medial aspect of her elbow. (Tr. 359.) Examination of Loberg's hands revealed trace, 1+ swelling of all of the digits in her right hand. (Tr. 359.) Dr. Buzard further noted that Loberg experienced some difficulty with right shoulder range of motion. (Tr. 359.) Dr. Buzard's report states, "Her grip strength appears to be nearly symmetric, maybe a little bit weak on the right but I got the impression that her effort was a little bit suboptimal." (Tr. 359.) Overall, Dr. Buzard diagnosed Loberg with right elbow pain, history of chronic low back pain, history of left knee reconstruction, history of Meniere's disease, and a history of mitral regurgitation and rheumatic fever. (Tr. 359-60.)

### F. Consulting Sources

State agency physicians reviewed Loberg's medical records on at least two occasions in 2004 and 2005. From their record review, they opined she could perform work at the light exertional level.

### G. Vocational Expert Testimony

A vocational expert, Robin Cook, testified at the December 2006 hearing. She identified six separate types of past relevant work as described below. (Tr. 599-602.)

| Job Title | Skill Level | Exertional Level |
|---|---|---|
| School Bus Driver | Semi-skilled | Medium |
| Receptionist | Semi-skilled | Sedentary |

Case 4:08-cv-00306-NKL   Document 12   Filed 12/12/08   Page 13 of 27

| Hand Packager | Unskilled | Medium |
| Light Truck Driver | Semi-skilled | Medium |
| Welder Assembler | Skilled | Medium |
| Support Analyst | Skilled | Sedentary |

The ALJ then posed the following hypothetical to Ms. Cook, assume that the claimant has/is:

• Same age, education, and work experience as claimant;
• Capable of lifting and carrying twenty pounds occasionally, ten pounds frequently;
• Capable of standing, walking, and sitting for a total of six hours in an eight hour workday;
• Must avoid crawling, kneeling, vibrations, climbing ladders, ropes, or scaffolds;
• Unable to perform repetitive lifting below waist level;
• Unable to perform rapid repetitive use of the dominant arm;
• Capable of occasional, nominal bilateral pushing and pulling;
• Unable to perform overhead work;
• Unable to work at heights or hazards;
• Unable to work around excessive noise.

(Tr. 602.)

In response to this hypothetical, the vocational expert opined that such a claimant would be capable of performing the past work as a receptionist and support analyst, as well as other light jobs in the national economy.[2]  (Tr. 602-603.)

On cross-examination, Ms. Cook testified that the normal break schedule for the jobs identified would be a ten minute break in the morning and afternoon and a thirty to sixty minute lunch break.  (Tr. 604.)  If a claimant needed breaks in excess of that amount, she would not be employable.  (Tr. 604-605.)  Ms. Cook further testified that an employer would tolerate a maximum of ten to twelve days absences a year before a job would be compromised.  (Tr. 605.)  Finally, Ms. Cook testified that if a claimant would have moderate

---

[2] Ms. Cook testified that such a claimant would be capable of performing work as a tanning salon attendant, a counter clerk, and a furniture rental consultant.  (Tr. 603.)

deficits in concentration, persistence, and pace, defined as one-third of an eight hour workday, she would be unable to maintain employment. (Tr. 605.)

### H. Loberg's Testimony

Loberg also testified at the December 2006 hearing. In addition to describing her living conditions, *supra*, she stated that she is unable to do anything repetitive with her right, dominate arm. (Tr. 590.) She described daily, sharp pain in her shoulder, elbow, and hand, with stiffness and swelling from her elbow down into her fingers. (Tr. 590, 591.) Loberg did not have the strength to hold onto objects like tools or a steering wheel, and had problems writing. (Tr. 590.) She testified that her fingers went numb, which made it difficult for her to determine whether or not she was grasping something. (Tr. 591.)

Loberg testified that she had migraine headaches a couple of times per month lasting for as long as a two days. (Tr. 589.) She noted associated symptoms to include sensitivity to light and vomiting. (Tr. 589.) Loberg also experienced constant pain in her lower back making it difficult to bend or sit for any length of time. (Tr. 589.) She testified that lying down with her knees elevated and taking medication provided some pain relief. (Tr. 589.) Loberg also had pain and swelling in her left knee which makes it difficult to stand for any length of time. (Tr. 592.) Loberg could stand for ten to fifteen minutes before she needed to sit down, and could walk a couple of blocks. (Tr. 592.) In addition to her medications, Loberg had tried heat packs, ice, and elevation of her legs in an attempt to decrease her pain. (Tr. 592.)

Loberg testified that Meniere's disease caused her to experience hearing loss, dizziness, and vertigo. (Tr. 592-93.) Loberg had some dizziness on a daily basis, but experienced a serious dizzy spell with severe vomiting once or twice a week. (Tr. 593.)

Emotionally, Loberg described herself as a "basket case." (Tr. 596.) She testified that she could not sleep and experienced crying spells on a daily basis. (Tr. 596.) Loberg was occasionally short-tempered and did not participate in any social activities. (Tr. 596.) She testified that she "hibernates in [her] cave." (Tr. 596.) Loberg constantly forgot appointments and misplaced things, and put post-it notes everywhere to help her remember. (Tr. 597.) She had a difficult time concentrating because of the pain and the medications. (Tr. 597.) Loberg testified that she did not always know what day it was and would often have to read a paragraph or an entire page over again in order to understand it. (Tr. 597.)

Overall, Loberg testified that she was no longer able to work full-time primarily because of the constant pain in her knees and arms, the medications and associated side effects, and her inability to drive because of those factors. (Tr. 598.) She further testified that she was "constantly hurting." (Tr. 599.)

## II.    The ALJ's Decision

The ALJ set forth the requisite five-step process for making disability determinations. *See* 20 C.F.R. §§ 404.1520, 416.920; *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir. 2003) (describing the five-step process). Applying those steps, the ALJ found that Loberg had not engaged in any substantial gainful activity after her alleged onset date of June 27, 2002.

Next, the ALJ also found that Loberg had multiple severe impairments including cubital tunnel syndrome status post two elbow surgeries, degenerative disc disease of the lumbar spine, right rotator cuff tendinitis, and Meniere's disease with mild hearing loss and dizziness;[3] further, the ALJ found that Loberg did not have an impairment or a combination of impairments that met or medically equaled the requirements of any of the listed impairments found at 20 C.F.R. Appendix 1, Subpart P, Regulation No. 4. In determining Loberg's impairments, the ALJ discounted the opinion of Loberg's treating physician and did not consider the opinion of the Kansas City Rehabilitation Institute. The ALJ also found that Loberg's testimony as to the severity of her medical condition was not fully credible.

The ALJ went on to find that Loberg had the Residual Functioning Capacity ("RFC") to perform work with the following restrictions:

• Lift and carry twenty pounds occasionally and ten pounds frequently;
• Stand and walk six hours in an eight-hour day;
• Sit for six hours in an eight-hour day;
• Push and pull occasionally and nominally;
• No crawling or kneeling;
• No climbing ladders, ropes, or scaffolds;
• No repetitive lifting below waist level;
• No overhead work;
• No rapid repetitive motions with her right dominant arm;
• No working in environments with excessive noise or vibration;
• No working at unprotected heights.

---

[3] The ALJ did not consider Loberg's knee impairments to be severe. Stating that she had not sought treatment for anxiety/depression, he found her mental problems to have less than a minimal impact on her ability to work such that they did not constitute a severe impairment. Stating that there was little, if any, reference to migraines in the record, the ALJ found this condition to be not medically determinable.

17

Finally, the ALJ found that Loberg could perform her past work as a receptionist and user support analyst.

## III. Discussion

Loberg argues that the ALJ erred in three aspects of his decision. First, she contends that the ALJ should have given controlling weight to the opinion of her treating physicians. Second, Loberg contends that the ALJ improperly evaluated her credibility. Third, Loberg avers that the ALJ should have found her knee impairments severe and considered them in combination with her other impairments.

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir.2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. March 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choices." *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at * 1 (8th Cir. Oct. 4, 2007). " An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

18

## A.     Medical Evidence

Loberg asserts that the ALJ improperly discounted the opinion of Dr. Trimble, her treating physician.  Generally, treating physician's opinions are entitled to controlling weight. 20 C.F.R. § 416.927(d)(2).  ALJ's may not disregard opinions of treating physicians to rely entirely on the opinions of consulting physicians for medical evidence:  "The report of a consulting physician who examined [a] claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician."  *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (citations omitted).  There are two exceptions to this general rule: (1) where the consulting physicians' assessments are supported by better or more thorough medical evidence; and (2) where a treating physician issues inconsistent opinions that undermine the credibility of those opinions.  *Id.*

In cases where ALJs do not give treating physician's opinions controlling weight, they must weigh physicians' opinions by considering several factors:

> The regulations provide that unless the ALJ gives a treating source's opinion controlling weight the ALJ considers all of the following factors in deciding the weight to give to any medical opinion: (1) examining relationship, (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) any factors the applicant or others brings to the ALJ's attention.

*Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)) (internal quotations and punctuation omitted).

In the instant case, the ALJ afforded "little weight" to the opinion of Dr. Trimble, the treating physician of record.  In discounting the opinion of the treating physician, the ALJ

summarily found that Dr. Trimble's opinion was unsupported by the objective evidence of record.

Dr. Trimble is the only medical source of record that had an on-going treatment relationship with Loberg. At the time of her hearing, Loberg had treated with Dr. Trimble and the other physicians at Liberty Family Physicians for over five years. During this time, Loberg had been diagnosed with degenerative disc disease, degenerative joint disease, Meniere's disease, cubital tunnel syndrome, and right lateral epicondylitis. In an October 2005 questionnaire, Dr. Trimble opined that Loberg would be capable of sitting and standing/walking for a total of about two hours in an eight hour workday. He further opined that Loberg would not have the ability to walk one block at a reasonable pace on rough or uneven surfaces. Dr. Trimble also noted that Loberg's pain would frequently interfere with attention and concentration needed to perform even simple work tasks. He felt that on average, Loberg's impairments would cause her to be absent from work more than four days per month.

In a September 2006 statement, Dr. Trimble's opinions remained the same. He opined with a reasonable degree of medical certainty that Loberg's condition had not improved since his October 2005 responses. Though not determinative of Loberg's application for benefits, Dr. Trimble expressed the belief that Loberg likely needed full Social Security benefits. According to Dr. Trimble's opinion, Loberg is unable to sustain employment at any exertional level.

In support of Dr. Trimble's opinion are the treatment notes from Liberty Family Physicians that detail multiple visits by Loberg in her attempt to obtain relief from her pain. Three different doctors in the practice, including Dr. Trimble, noted Loberg's symptoms to include lower back pain with associated tenderness and spasms radiating into her leg, pain and tingling in her right arm, and knee and joint pain.

Objective testing further documents a medical basis for Loberg's reports of pain, and further supports Dr. Trimble's opinion. In October 2002, an x-ray of Loberg's left hip revealed mild degenerative changes, leading to a diagnosis of degenerative joint disease. An x-ray of her back indicated spondylolisthesis at L5-S1 and degenerative changes in the thoracic spine. Three years later, an x-ray confirmed degenerative joint disease in Loberg's knee.

Also supporting Dr. Trimble's opinion is the independent evaluation of the Rehabilitation Institute. It appears that the ALJ failed to consider the Rehabilitation Institute opinion. This failure may not have constituted reversible error in and of itself; however, where the opinion of the Rehabilitation Institute supported that of Dr. Trimble, the ALJ's decision to give little weight to Dr. Trimble's opinion on the basis that it was unsupported is suspect.

The ALJ did not consider the substantial evidence supporting Dr. Trimble's opinion. In addition, after refusing to give Dr. Trimble's opinion controlling weight, it appears that the ALJ failed to consider the competing medical opinions under the factors set forth in *Wagner*. Having examined and treated Loberg over several years, Dr. Trimble's knowledge of

21

Loberg's impairments is unmatched by any other medical source in evidence. The ALJ did not provide specific reasoning or citation to the record that would support the discounting of Dr. Trimble's opinion or the finding that the opinion held "little weight." On remand, the ALJ should consider all record medical evidence in considering whether to discount the opinion of Loberg's treating physician.

**B.      Loberg's Credibility**

Loberg argues that the ALJ improperly considered her credibility. The Court will defer to an ALJ's credibility determination where it is supported by good reasons and substantial evidence. *See Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir.2005). An ALJ "may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "In evaluating a claimant's allegations, in addition to the objective medical evidence, an ALJ must consider a claimant's prior work history; daily activities; duration, frequency and intensity of the pain; dosage, effectiveness and side effects of medications; precipitating and aggravating factors; and functional restrictions." *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003) (citing *Polaski*, 751 F.2d 943, *inter alia*). ALJs are not required to discuss each of these factors in a methodical fashion before discounting subjective complaints, so long as the ALJ acknowledges and considers those factors. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996).

The ALJ noted the relevant factors for evaluating credibility. He stated that the objective medical evidence did not support the degree of limitations Loberg alleged. The

Case 4:08-cv-00306-NKL   Document 12   Filed 12/12/08   Page 22 of 27

ALJ noted that DSS's examining doctor found that Loberg displayed sub-optimal effort in demonstrating grip strength, which the ALJ found indicative of exaggeration. The ALJ considered: that testing showed Loberg to have equal strength in her arms, unremarkable nerve conduction results, and no signs of atrophy; as well as that doctors had generally opined that Loberg was capable of light work.

Turning to Loberg's testimony, the ALJ took several of her statements out of context in a manner that created non-existent contradictions. Contrary to the ALJ's statement that Loberg testified to rarely taking her medications, she actually testified that she took at least three different medications on a daily basis, and that it was only the Vicodin that she took irregularly because it "just knocks [her] out." Contrary to the ALJ's finding, Loberg's testimony about her sleep habits was not contradictory: she testified that she experienced sleep difficulties because of her back pain and depression; she described sleeping all day only when she took certain medications, and that she did not like to do that. The ALJ further made a misstatement of the record when he discredited Loberg's concentration difficulties because she testified that she read during the day: the ALJ failed to mention that Loberg also testified that she would often have to re-read a paragraph or an entire page because of her limited concentration. The ALJ's decision relied significantly on this mistaken assessment of Loberg's testimony in concluding that she was not entirely credible.

At the same time, it appears that the ALJ did not consider credibility factors which weigh against his conclusion. Loberg had a consistent prior work history: she held her last job for six years; and she attempted to return to work after the alleged onset of disability.

23

Loberg testified to the significant side effects of her strong medications. She testified to her rather limited daily activities. An independent evaluation concluded that Loberg had significant functional limitations that left her "competitively unemployable."

Moreover, this is not a case in which Loberg received only minimal medical intervention and took pain medication on an occasional basis. The record demonstrates "repeated and consistent visits to doctors," *see Sing. v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000), which began before her application and even before her alleged onset of disability. At the time of the hearing, Loberg was taking, and had taken numerous prescription medications prescribed by physicians. *See id.* She had "availed [her]self of many pain treatment modalities," including various surgeries and powerful medications. *See id.* (finding that ALJ improperly dismissed treating physician's opinion).

Where the ALJ mistakenly discredited Loberg based on non-existent contradictory statements while apparently failing to consider evidence supporting her credibility, his finding regarding her credibility is not reliable. On remand, the ALJ should reconsider Loberg's testimony and the evidence relevant to her credibility.

C. **Knee Impairments**

Loberg also argues that the ALJ failed to appropriately consider her knee impairments. First, Loberg states that the ALJ failed to find her knee impairments severe, despite the fact that the record clearly establishes that the knee impairments cause symptoms that impose more than minimal restriction on her ability to perform basic work activities and sustain employment. Second, she states that the ALJ failed to consider her knee impairments in

Case 4:08-cv-00306-NKL   Document 12   Filed 12/12/08   Page 24 of 27

combination with her multiple other impairments. The Commissioner did not respond to this argument.

At the second step in the five-step sequential evaluation process, the ALJ determines whether a medical impairment is severe. 20 C.F.R. § 404.1520(c). A severe impairment is one, which alone, or in combination with other physical or mental impairments, imposes more than minimal restrictions in the ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *Bowen v. Yuckert*, 482 U.S. 137 (1987) (holding that the test for severity is a de minimus one). A claimant suffers from a severe impairment when the impairment significantly limits the capacity to perform work-related functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, the use of judgment, responding appropriately to usual work situations, dealing with changes in a routine work setting, and understanding, carrying out and remembering simple instructions. 20 C.F.R. §§ 404.1521. In this case, the ALJ found that Loberg's knee impairments were non-severe because these issues "have generally been resolved with reconstructive surgery and she does not currently appear to have any significant knee limitations."

Loberg's knee impairments had been noted for years prior to her onset date of disability, including a knee reconstruction in 1988. Since that time, Loberg continually noted difficulties with her left knee. In an October 2003 report, it is noted that Loberg "describes permanent hindrance from the left knee condition," including limiting her abilities to lift, carry, squat, crawl, kneel, and climb. On examination, weakness was noted when Loberg attempted to arise from a squat, secondary to knee pain. It was also reported that Loberg

25

limped on the left due to knee pain with heel and toe ambulation. Loberg was restricted from doing sustained squatting, crawling, kneeling, or climbing because of her pre-existing left knee pain. The following year during a consultative examination, Loberg continued to complain of stiffness and swelling in her left knee, noting pain with squatting, crawling, and standing for extended time periods. In September 2005, during a vocational evaluation it was noted that Loberg presented in constant pain during the evaluation, walking at a slow, deliberate pace. A secondary diagnosis of internal derangement of the right knee was reported. Finally, Loberg presented to her treating physician, Dr. Trimble, in October 2005 with complaints of severe left knee pain for the past two months. Loberg described sharp, shooting pain, occasional swelling, and sudden sensations of her knee giving way. An x-ray revealed moderate degenerative changes of the knee.

There is significant record evidence that Loberg's knee impairments cause her to suffer from symptoms that impose more than a minimal restriction on her ability to perform basic work activities and sustain employment. Consequently, Loberg's knee impairments are severe, and the ALJ erred by failing to make such a finding.

When a claimant asserts a number of different impairments, the Act requires that the ALJ consider the combined effect of all of the individual's impairments without regard as to whether any individual impairment, if considered separately, would meet the definition of severe. 20 C.F.R. § 404.1523. "The ALJ must consider the impairments in combination and not fragmentize them in evaluating their effects." *Delrosa v. Sullivan*, 922 F.2d 480, 484 (8th Cir. 1991). Because the ALJ did not find Loberg's knee impairments severe, the effects

Case 4:08-cv-00306-NKL   Document 12   Filed 12/12/08   Page 26 of 27

of the knee impairments were not considered in combination with her other impairments. This undermines the ALJ's determination with regard to the impact of Loberg's impairments on her ability to work. On remand, the ALJ should evaluate Loberg's collective impairments, including those relating to her knee.

## IV. Conclusion

Accordingly, it is hereby

ORDERED that Plaintiff Robin Cahill's Petition [Doc. # 4] is granted. The ALJ's decision is REVERSED and REMANDED for further proceedings consistent with this Order.

s/ NANETTE K. LAUGHREY
NANETTE K. LAUGHREY
United States District Judge

Dated: <u>December 12, 2008</u>
Jefferson City, Missouri

Case 4:08-cv-00306-NKL   Document 12   Filed 12/12/08   Page 27 of 27